Charles E. Bay, Appellee, v. The Baltimore & Ohio Railroad Company, Appellant.

Gen. No. 40,498.

Opinion filed April 26, 1939.   Rehearing denied May 8, 1939.

EDWARD W. RAWLINS, H. D. SHEEAN and E. W. LADE-MANN, all of Chicago, for appellant.

EDWARD B. HENSLEE and SAMUEL COHEN, both of Chicago, for appellee.

MR. JUSTICE HEBEL delivered the opinion of the court.

This suit was instituted by the plaintiff, Charles E. Bay, to recover damages on account of personal injuries sustained by him October 15, 1936, at Shelby, Ohio. He was at the time employed by the defendant as a conductor and claims that he was injured while engaged in a switching movement by reason of his left hand being caught between the couplers of two freight cars. Trial was had before the court and a jury, and a verdict was returned by the jury in favor of the

plaintiff, assessing his damages at $17,000. After the usual motions, judgment was entered by the court on the verdict, from which judgment the defendant appeals.

Plaintiff's complaint alleges that on October 15, 1936, the defendant was a railroad corporation engaged in the business of handling and transporting commerce as a common carrier, and operated its line of railway through the States of Ohio, Illinois, and through Shelby in Richland county, Ohio, and that at that time plaintiff was in the employ of the defendant as a train conductor, and at the time of the accident plaintiff and defendant were engaged in transporting cars in interstate commerce.

It is further alleged that the plaintiff was in the performance of his duties as a conductor at Shelby, Ohio, and while adjusting the coupling between two cars of the train, through the careless, negligent and wrongful conduct of the defendant in violation of the act of Congress, the cars moved together and caught and crushed plaintiff's hand and arm, and for the reasons alleged, this suit was instituted.

Plaintiff's complaint is based upon the claim, and the sole claim relied upon by him upon the trial, that the defendant was guilty of a violation of the Safety Appliance Act with reference to couplers, 45 U. S. Code Ann. sec. 2, and at the request of the plaintiff the jury was so instructed.

At the close of plaintiff's case and again at the close of all the evidence the defendant moved the court in writing for a peremptory instruction to find it not guilty. These motions were overruled, together with defendant's motion for a new trial.

From the evidence it appears that the accident in question happened on October 15, 1936, at Shelby, Ohio, that at the time plaintiff was working as a freight conductor in the employ of the defendant, and

was working on a run from Mansfield, Ohio to Willard, Ohio. He was an experienced trainman, having been a brakeman or conductor for the defendant for about 35 years. At the time of the accident he was 60 years of age.

Plaintiff and the crew, of which he was conductor, were at the time in question engaged in switching at what is referred to as the house track, and just prior to the time of the happening of the accident he had been riding a cut of two cars into that track for the purpose he said of coupling onto another car which was standing on said track, which car was later to be switched out. He was riding the lead car of the two which were moving. In describing the accident plaintiff testified on direct examination that they had cut off two cars and were putting them on the house track; that his head brakeman cut the cars off on the main track; that as he cut them the engine gave them a little start into the house track; that he, the plaintiff, rode the lead car onto the siding; that the knuckle on this car on which he was riding and the knuckle on the car standing on the house track were both open; that when they came together they both locked; they were so wide they locked; that they would not shut. He further said that the standing car bounced away five or eight feet; that he then stepped off and went in between the ends of the cars and pulled the drawbar over; that his foot slipped and he fell forward; that to pull the drawbar over he put one hand underneath and one on top and pulled it towards him; that his foot slipped and he fell forward; that he threw out his hands and his arm got caught in the drawbar; that the two cars, the two that were being shoved in on the house track, followed him up; that they were coming slowly and he had plenty of time and plenty of room if he had not fallen; that his arm dropped right on top of the coupler and was caught

between the couplers of the standing car and the lead car. The plaintiff testified he was thoroughly familiar with the yard and the condition of the tracks, and was in there practically every day for some months prior to the accident and knew the condition of the track all the time, and that he was the man who was at the time directing the movement of the train and the placing of the cars. He further said that he got off the cars while they were moving slowly, ran ahead between the moving cars and pulled the drawbar over; that the car he was on had a cutting device, a pin lifter, for the purpose of opening or closing knuckles; that he did not try to use the pin lifter at all; that the cars coupled and came to a standstill and coupled his hand into them; that he had just let loose of the drawbar when he slipped and that is what cut his arm.

There were no actual eyewitnesses to the accident other than the plaintiff.

Following the happening of the accident and on the same day, Irvin J. Bundschu, a witness for the defendant, who was assistant car foreman for the defendant in the vicinity of Shelby, inspected the cars involved in the accident. He said he made a complete inspection of the body, safety appliances, underframe, couplers, trucks, etc.; that he found the couplers to be in good condition. He said he had been inspecting cars since 1914, and was familiar with the various types of couplers; that the cars in question were equipped with A. R. A. couplers. The evidence tends to show that at the point where the coupling was made, the track was straight; that by defective couplers the witness meant broken or distorted or bent out of line which would give a side motion and let the coupler pass. He further said he did not find any such condition on the couplers in question.

The defendant called as a witness Joseph Merritt, who was the head brakeman of the crew with which the

plaintiff was working at the time, and the man who cut the two cars in question off. He testified that he did not see the accident but learned about it immediately afterwards; that he was the first man to come up after the accident; that the cars involved in the accident were on the house track; that one had been standing there; that he did not make a personal examination of the couplers, but after the accident they separated the two cars and coupled them for inspection, at which time they were moved to a different track; they were coupled together and they separated them.

The defendant contends there is no evidence in the record tending to show that any supposed violation of the Safety Appliance Act was the proximate cause of the injuries complained of by the plaintiff. As we have already indicated, the plaintiff testified he had adjusted the couplers and that he then fell and threw his hand into them because of the fact that he slipped; that he pitched forward, let loose of the drawbar and as a result cut his arm. The defendant further contends it is clear that according to his own story he had adjusted the coupler and would not have been injured if he had not thereafter slipped and fallen; that under this situation, the supposed violation of the statute was not the proximate cause of the injury but at most did nothing more than furnish a condition which made the accident and injury possible, and calls to our attention the case of *Streeter v. Humrichouse,* 357 Ill. 234. The decedent was injured by an automobile while he was riding on the footboard of an engine in violation of a rule of the railroad company. In discussing the question under consideration and after citing and quoting from various decisions, the court said: ''In the case before us McGann's breach of the rule by riding on the foot-board at the end of the tender did nothing more than furnish a condition which made the injury he received possible. It did not directly and

proximately produce or help to produce the result as an efficient cause of the collision and consequent injury.''

The defendant further cites in support of its position the case of *Lerette v. Director General of Railroads*, 306 Ill. 348.

The plaintiff's reply is that he was riding down on one of the cars for the purpose of seeing that they were coupled with another car; that he did this in the usual, proper manner required in railroading; that the cars did not couple; one coupler went by the other. In railroad parlance it is termed ''locked.'' The plaintiff observed that one coupler was out of alignment and therefore did not couple, and he immediately, in performance of his duty, alighted while the cars were moving slowly, and pushed the coupler squarely in the center so it lined up perfectly, when the other car came back and caught his arm. The plaintiff further calls our attention to the fact that the plaintiff and the defendant were engaged in interstate commerce; that Congress enacted these safety appliance requirements for the protection of employees, and the United States Supreme Court has consistently held that a mere failure of the safety device to operate, even though the appliance is in perfect condition, even though the defendant was in the exercise of care and caution in maintaining, operating and inspecting the device, liability fastens against the railroad if the employee, in a coupler operation, went between the cars when the coupling failed to make automatically, to adjust them with his hand.

One of the cases upon which the plaintiff relies is *Brady v. Terminal R. Ass'n of St. Louis*, 303 U. S. 10, 82 L. Ed. 614, 58 Sup. Ct. 426, wherein Chief Justice Hughes said:

''This final question must be determined in the light of the nature of the obligation resting upon the carrier

in relation to the use of a defective car. The statutory liability is not based upon the carrier's negligence. The duty imposed is an absolute one, and the carrier is not excused by any showing of care, however assiduous.''

The defendant contends that the trial court erred in refusing to instruct the jury to find the defendant not guilty at the close of all the evidence as requested by it for the reason that there is no substantial credible evidence in the record tending to show or from which it could properly be found that the defendant was guilty of a violation of the Safety Appliance Act as charged, and suggests that the plaintiff's evidence is improbable; that he was a man who had had long experience in railroading. He said the cars were moving very slowly and a little upgrade; that they came together but the couplers did not couple; that the impact shoved the standing car on which the brakes had been set five or eight feet ahead; that he then got off and went between the ends of the cars to pull the couplers over and that the two cars, the head one of which he had been riding, continued moving slowly and bumped again, and that after he had the couplers pulled over, he slipped and fell, throwing his hand between the couplers. Not only that, but he said he did not try to use the pin lifter with which the cars were equipped; that it is wholly improbable that a man of plaintiff's long experience would have attempted to adjust the couplers while the cars were still moving, for there was apparently no hurry, and such act was wholly needless. However, wholly apart from that, the fact is, according to the statement which the plaintiff made and signed following the accident, that he was not at the time the accident occurred attempting to adjust the couplers or make a coupling at all. It appears the accident occurred on Thursday and that Mr. Rogers, the train master, took the plaintiff's state-

ment. In the statement which was signed by the plaintiff he stated he did not know whether he slipped or fell off the step or how it was, but whatever it was it threw him between the cars; that it was done so quickly he did not know what happened; that he must have flung his arm in, as he had no occasion to open the knuckles because they were open. And in response to the question of whether or not he was adjusting the couplers with his hands, he said, "No, sir, I did not adjust the couplers, no the couplers were open." He further stated he knew it was a violation of the rules to attempt to adjust couplers while cars were moving and that there was no occasion for him to touch the couplers at all. He also said what he intended to do when he got off was to put a chunk under the wheels to hold the car until he came back after it. Upon being asked if he were getting off the step how it came he did not fall under the car, he answered, "That is what I don't know, whether it hit the other car and knocked me in there or not." He further said in the statement that the couplers seemed to be in good working order.

It appears that the plaintiff admitted he signed the statement. The only thing he says is that he did not remember what was in it. He does not claim that he was not in a perfectly normal mental condition or did not know what he was talking about when Mr. Rogers called and took the statement. It also appears that one Bond, the station agent at Shelby, who had known the plaintiff for 20 years visited him at the hospital almost every day he was there and who was the man who took the statement back to the plaintiff for the purpose of having him read it over and sign it, testified that he and the plaintiff went over the statement together; that they went over it question by question, after which the plaintiff asked him what he, Bond, thought about it, and in response he told the plaintiff, "Well, Charlie, I don't know a thing about it. Use

your own judgment, and if you think it is all right, sign it, and if you don't, don't sign it." Whereupon the plaintiff signed the statement, but the plaintiff upon cross-examination admitted he talked to Bond about some of the things in the statement when Bond brought it up to be signed. And then a witness named Neibarger, who was an engineer and who had known the plaintiff for about 30 years, said he went to the hospital to see the plaintiff; that the plaintiff was feeling first rate, able to talk clearly and apparently understood what they were talking about; that he asked the plaintiff how it happened and he said, "Well, I don't know"; that he went back to the hospital several days later, and said to the plaintiff, "Perhaps if I had not laid off this would not have happened," and the plaintiff replied, "It was no fault of the engineer. I don't know how it happened."

Another railroad man named Vanoff called at the hospital to see the plaintiff, and some other men were waiting outside the plaintiff's room while Mr. Bond and his wife were in the room, and he heard the plaintiff and Bond talking about the matter. Upon going into the room and talking with the plaintiff, he, the plaintiff, told them he did not know how it happened any more than they did. Dr. Dowds, the doctor who treated the plaintiff, also testified that the plaintiff told him he did not know how the accident happened. So that when we come to examine the plaintiff's story and the statements he made there is an indication that they were contrary to the testimony given by the plaintiff when the cause came up for hearing.

The only explanation by the plaintiff and which appears in the record is that he did not give a different version, he always stated that he did not know what happened. He never described the accident as happening in any particular manner. His motive and reason must be clear and apparent. The company's

rule—all railroads have it in their rule book—is that "employees are prohibited from adjusting the coupler or knuckle with the hands or feet while the car or engine are about to be coupled—or to attempt to adjust couplers while cars are moving." (Rule 20 on B. & O.) In the statement the defendant took from the plaintiff, his knowledge of this rule was emphasized. The poor, unfortunate fellow probably felt he would be reprimanded, punished, put out of service with all rights and be deprived of everything because he violated this apparently mandatory and absolute rule and went in between the moving cars to adjust the coupler. Then it is stated that one fact should appear outstanding: "It is impossible that the accident happened without the plaintiff knowing just how it did." But it must be assumed that in spite of pain and opiates, the plaintiff knew the mission of these folks when his statement was being taken. Probably pressed and goaded by them, under the circumstances he gave them as little information as he possibly could as far as details are concerned, always affirmatively saying he did not know just what caused the accident which caught his arm in the couplers and crushed it off. There is no case of the plaintiff giving two versions of the accident or the occurrence; it is a case of the plaintiff purposely and wilfully concealing the facts for his own motive, to avoid chastisement in some form or other which he foolishly believed would have come to him had he told the truth. This statement by the attorney in plaintiff's brief is rather startling. We are unable to understand the theory of these false statements. In pointing to the facts as they appear in the record, the plaintiff's theory is that the plaintiff purposely and wilfully concealed the truth in the statement above referred to, and he likewise falsified in the numerous statements he made to his fellow workers that he did not know how the accident

occurred, and this was the character of his story until he testified at the trial. The defendant states that to permit testimony of such character to form the basis of a judgment would, to say the least, be making a travesty of the law, and we quite agree with this suggestion made by the defendant. The testimony of witnesses must be true, not only for consideration by the court, but also by the jury, and after considering the statements of counsel for the plaintiff, and particularly the statement that "the plaintiff purposely and wilfully concealed the facts for his own motive, to avoid chastisement in some form or other which he foolishly believed would have come to him had he told the truth," the court is of the opinion that it is justified in reversing the judgment and remanding the cause for another trial.

*Reversed and remanded.*

Denis E. Sullivan, P. J., and Burke, J., concur.